Case No. 24-6153, Diego Pavia v. National Collegiate Athletic Association. Oral argument not to exceed 15 minutes per side. Mr. Killaroo, for the appellant, you may proceed. Mr. Killaroo, welcome. I am going to ask you to address both the mootness and the merits. I assume you were going to do that, but why don't we go with mootness and do that first and then turn to the merits as well. We'd like you to address both sets of arguments. Of course, Your Honor. To start with mootness, the case is in moot because there's a live controversy between the parties over whether the NCAA's eligibility rule should restrict Mr. Pavia's continued ability to play. The easiest answer to this is that in the district court, Mr. Pavia challenged not only the four-year rule, but also the redshirt rule. And I think the theory is that challenging the redshirt rule, which is another NCAA eligibility rule, could give him yet another season to play. Right. That would be, as you point out in your supplemental brief, and as I understand it, a sixth year, correct? So really, the redshirt rule, however you want to phrase it, he would want to play a sixth year, but isn't the subject – I totally agree with you on the complaint – isn't the subject of the PI just the 2025 year, which does not impact the redshirt rule? Yeah, I'm not sure that's right, Your Honor. I think the 2025 season was obviously what was very much in front of the judge, but I think the decision says that NCAA eligibility rules are subject to the Antitrust Act, have to go through a rule of reason analysis, and that applies just as well to the additional rule. I'm not exactly sure what the district court would say if confronted with the question of… Explain to me why I'm wrong, but I think of that as maybe the reasoning of the district court, but not the holding. The holding is he can play in 2025, and now you've said, look, even if you, Court of Appeals, reverse that, which obviously you think we should, we aren't still going to let him play in 2025 because the waiver applies throughout, and why aren't what we're doing at the moment? I don't think it's academic, Your Honor, because I think the question of mootness is not just about the specific question that's up on appeal, but about whether there's a live controversy between the parties in the case, and there's indisputably a live controversy between the parties in the case insofar as petitioners saying eligibility rules are commercial and subject to the Sherman Act, and those eligibility rules are improper insofar as they're restricting not only this season, but also next season, which they've left on the table through the mootness analysis. I think there's also no question, and I don't think Your Honor's need to reach the capable of repetition issue, but I don't think there's a question that this is an issue that keeps recurring, that can evade appellate review in the ordinary course. We understand there's a waiver here, but that's true. Well, you make a different argument in your brief that I thought was at least somewhat compelling, which is he could have brought this a lot sooner. It seems to me if I'm a kid going to JUCO next year, I could challenge the rule. This has been a consistent issue with all of these cases, Your Honor, which is that that is true, and yet the challenge almost invariably happens at the 11th hour right before the season is set to begin. Is that really the capable of repetition yet evading review law, that we let the plaintiffs determine whether it's capable of repetition yet evading review? Well, I think part of the reason for the doctrine is that you have these issues that are evading review, and we can't make the plaintiffs come sue us earlier in their career and say, hey, in four years, there's going to be an issue with eligibility, so you better raise the issue now if you want it to be evaded. If you did, would they have standing necessarily? I mean, how do we know they're going to be playing in four years? It seems odd to me that a first-year JUCO player would sue the NCAA to say, four years from now, I might still be playing football. I might be wanted by a Division I team. I might receive NIL. It seems awfully speculative. I think that would be true as well, Your Honor, but that just sort of illustrates the pickle that I think we're in, which is either people sue too late, which is the problem we continue to find ourselves in, and then it avoids review in that respect, or they could potentially, I suppose, try to sue too early, and then you would have a different set of jurisdictional issues that could arise. Well, it's not because we're running out of time. It's because you offered a blanket waiver for the 2025 season. So without that, there wouldn't be a live controversy before us for the 2025 season. So the timing issue, to me, seems somewhat collateral to the fact that NCAA has offered this waiver. The waiver has been extended for this season. That's true for athletes who are precisely in Mr. Pavia's position and not for athletes in other positions. I think, for example, there's a few cases that are awaiting a potential decision. In this case, there's a Ziegler case, there's the Asuna Sanchez case, and they've both been stayed pending appeal where there's not a But I think it really does go back to the... I think our position on this at least goes back to the answer I gave earlier, which is, from our perspective, and we think the law, the mootness question is not just the specific issue that is on appeal, but the case or controversy between the parties, and there's indisputably a live case for controversy here. Well, we only have appellate jurisdiction in this interlocutory posture because there was a preliminary injunction issued by the district court. So the scope of that preliminary injunction on its face, which confers appellate jurisdiction on us, is that the bylaw at issue is hereby restrained to preclude Pavia from playing NCAA Division I football in 2025. That's the scope of the injunction that is on appeal. So what happens different with respect to Pavia playing NCAA Division I football in 2025 if we rule for Pavia or rule against Pavia in the appeal? As to 2025, nothing. But as to 2026, a lot of different things could happen. That controversy is still live in the district court. Why couldn't the district court decide that before 2026? I mean, that is live in the district court. No matter what we do, you're going back. Why couldn't they decide it in 2026, now for 2026? Your Honor, it very well could. It's, I guess, one of these things where it sort of depends on the specific litigation choices of the plaintiff. But if you follow the timeline of the first case and he wants an extra year, I would venture to guess we'll be back in the district court within a matter of weeks, if not months. And then the issue will come right back up to the court and we'll have the same exact issue we have. We could choose not to grant a waiver this time, but then you're still in the same situation of having to grant extraordinarily expedited review for this issue to ever be decided in a way that matters when there's still a dispute between the parties that's live over the application of eligibility. I mean, we just showed we're capable of granting expedited reviews, so that shouldn't be a problem. And the district court should be able to decide it in a timely fashion. That seems to me pretty obvious as well. I think it's possible, Your Honor, but again, the injunction that was sought was an injunction that would say eligibility rules can't restrict Mr. Pavia's eligibility. I agree that the district court confronted with the facts as they were presented said only 2025, but that wasn't part because the district court didn't face the five-year rule, right? I mean, the five-year rule wasn't an issue now for this case. It's an issue for 2026. I can see the five-year rule is much different in substance than the rule, the JUCO rule. I don't, I think it might be the redshirt rule that Your Honor is referring to. I think the JUCO and five-year rule is that issue in this case because that's the operation of rules that says he has run out of eligibility. I think the pathway for seeking more eligibility, if I understand it, would be a challenge to the redshirt rule on the theory that there should be a sixth, realistically seventh, but you take the COVID season out of it season because he could play as a redshirt year and so should get yet another season. Can you explain to me why the, isn't this his fifth year? This is, yes, his fifth year. It's actually his sixth, but you take the COVID waiver out of it. The COVID waiver. Yes. So the five-year rule, it wouldn't bar him from playing this year. The five-year rule, that's correct, Your Honor, but the four-year rule does because he's used the seasons of competition. As to next year, both the five-year rule and the four-year rule would preclude competition, but there's another challenge to an eligibility rule to seek that sixth season. So the board gave a one-year waiver, so across the board, but the limitation on JUCO players having more than two years playing eligibility to play two years at JUCO, that's still on the books. That's correct. Does that matter to our mootness analysis? I think it does, Your Honor, because ultimately the question in this case is about whether eligibility rules are subject to antitrust review and then if so, how they should be evaluated under the antitrust laws. The JUCO rule is still on the books. The four-year rule is still on the books. The five-year rule is still on the books. There's an intent, and there has been an application of those rules to dozens of other student athletes who were slightly differently situated to Mr. Papia. As I think you've seen from the appendix we filed, there's 20, 30, 40 cases pending in the courts that raise the same exact set of issues and it will be right up in front of the court imminently. It's not backing away from its enforcement of the rule going forward? Not at all, Your Honor. I think we granted a waiver at the time out of reasons of equity, but I think those waivers have not been granted since then because you've sort of seen the Pandora's box open since the original decision in this case. This was actually the first. So the federal government regulation, the Department of Education was challenged, and a district court adjoined it, and there was an appeal, that preliminary injunction, and the government said, well, we're not going to enforce this regulation for the next year, so we think that moots the appeal. What do you think we would do? I would think, Your Honor, that in that situation, capable of repetition would apply if the government said, maybe not... What about voluntary cessation? I think you would be in the same... That doctrine would work just as well, Your Honor, but I don't think there's really... It might work better. It might work better. I think here there isn't even a cessation because the intent is to continue to enforce the rule going forward, so if the government strategically said, to your point, we want to move the case for purposes of just avoiding this judge, this panel, but tomorrow we're going to do the same thing in a different case, I don't think Your Honors would allow that to happen, and here you do have dozens of cases behind this one presenting the same issue where we intend to enforce the rule and believe the rule is valid under the antitrust laws. The Board of Governors has passed a waiver for the year, but there's been no further documentation of that. There's no formal contract that's been entered. It's not been committed to formal writing. Is that correct? I think it's been passed in the way board action is typically passed on an emergency basis, so there's not a formal change to the rules. There's policy that applies, and I should note, it is, as I think we've made clear in the briefing, narrow in scope to folks who are in the exact same situation as Mr. Pavia, so if they've used their five years, for example, or they're claiming that Division 2 or Division 3 years shouldn't count, that wouldn't fall within the scope of the waiver as well. Suppose the case wasn't moot and we ruled for you on the merits. Would the plaintiff here have a lawsuit against you for reliance? I mean, I don't think there's a breach of contract case necessarily. Is there some kind of suit that the plaintiff might be able to bring against you at that point? I don't know what the suit would bring because he would have gotten more than he was entitled to under the logic of the decision, which is the ability to play for this previous year. So he's the one who wanted the additional season of eligibility, so I think if he got that by virtue of what we view as an erroneous district court decision that you then reversed, I don't think there would be any necessary pathway back into court. I see my time is getting very short. I would like to briefly address the merits if I could. Absolutely, and you can take some time to address the merits because we've had a lot of questions. Can I just ask you about, just to go back to Judge Roehler's question just so I understand it, the waiver though, you are not, no matter what we do, you were saying unequivocally you will not lift the waiver, correct? For Mr. Pavia and the small group of people like him, that is correct. But for everyone else, including folks who are in the same junior college situation but have used their five years, for example, in every other case where these rules are challenged, we intend to enforce them. In fact, we've been enforcing the rules, which is what leads to the flurry of cases. So whether it's a voluntary cessation argument, whether it's a capable of repetition argument, over and above the fact that we think there's still a live I don't know that I have that number for you, Your Honor, but I do know that shortly after we granted the waiver, you know, dozens of other lawsuits were filed by folks who were not exactly situated. So whether it's a small group or a large group, I don't know, but the issue is certainly persisting. Why don't you take 10 minutes or so on the merits and I'll give the side equal time. Thanks, Your Honor. For decades, courts, including this court and Bassett, have understood the NCA's core eligibility rules to be non-commercial and outside the scope of the Sherman Act. And that's because those rules, like rules saying that you have to be of a certain age to play Little League or have to be a woman to play on the LPGA tour, are eligibility rules that don't regulate the terms of a commercial transaction, but simply define and delimit who can in a unique sports offering. I guess what I struggle with, and you should tell me why I'm wrong, is I'm like, maybe I get, and I understood your brief about GPA and these types of things. I guess this one is like, you can only make money for this long. And I'm thinking of Justice Kavanaugh's concurrence in Austin, where he talks about how we should think of it similarly to kind And you would never say you can only be an actor or actress for five years or something. And it seems to me clearly for Mr. Pavia, you're limiting his earning capability. I don't think anyone would debate that the NIL opportunities are pretty lucrative for college quarterbacks. Your Honor, I think Alston helps us on this front in two different ways, including Justice Kavanaugh's opinion. So starting with Justice Kavanaugh's opinion, he said in the context of that concurrence, everyone agrees that the NCAA can require student athletes to be enrolled students in good standing. And that's what this rule is. It's a rule that says you have to be pursuing a college degree four years over a five-year period. Actually gives folks more than the usual time that a college degree is expected to be completed in, more time than Mr. Pavia needed. But I think it falls within that. I would also note that in the Alston majority, and I believe this is at page 101, there's a reference to a core principle of antitrust law, which is that businesses get substantial latitude to define and create unique product offerings to create competition. And that is what college sports is. It's a unique and different college sports offering from professional sports. So I think this falls comfortably within Alston, and it falls comfortably with an antitrust law more generally to say these rules are non-commercial. So they sort of pit the NCAA Division I against JUCO players. And the player has to choose which market or which level wants to play at. And by choosing JUCO, it's directly being harmed by its potential future profitability through NIL for playing in the NCAA. So why isn't this just like a classic restraint on trade where you're basically shutting down the JUCO market? Because if a player is thinking about maximizing their financial worth, the only, it seems like the only option is to go play Division I football if you could. You know, I think, first of all, it doesn't actually restrict the JUCO market because folks can make the choice to go to JUCO if they think it will eventually maximize their earnings challenge in Division I. You may have, for example, a quarterback who has the option to make millions of dollars a year as an immediate freshman at Michigan or Ohio State, but another may say, well, that's not the best opportunity for me. I'll go to JUCO. But I think going back, the question under the Sherman Act isn't whether there's some... You're saying it's a long-term investment? You take nothing up front to earn it later on? In other words, that's not really a... There's only one market there that's going to pay you still in that example, right? JUCO's not paying anyone. Right. Well, I think if you get to the antitrust... If you're thinking about money, why aren't you always picking basically the NCAA? Because you may not make as much money in the NCAA depending on whether you can get... But making it on JUCO. Well, right. But you may not have a spot in the NCAA to begin with based on your talent level. Well, then you're not choosing the NCAA. The NCAA has excluded you. Right, but I think... But you are actually choosing. Someone is actually choosing. In that example, they're not choosing. There was no spot for them in the NCAA. For someone who's actually choosing, aren't they always choosing the NCAA based upon the regime that you've set up to limit their profitability? Because if they go to JUCO, they lose time in the NCAA. They can be paid every year they're playing Division I football. I would say a couple of things about that, Your Honor. I think if Your Honor gets to the step of antitrust analysis, where you're looking to that, if we're in the ambit of the Sherman Act, then I think the Plymouth-Whaler decision from this court is instructive, because that decision says that substituting more or less talented players for each other in a market is not an anti-competitive injury in a relevant market. And that's what this would be. That was a time. That was pre-NIL. Pre-NIL, that decision. Right. I mean, my understanding is better players get paid more money, both in the direct compensation scheme that exists after the house settlement and through NIL. So NCAA's theory seems to be, I mean, tell me if this is part of the pro-competitive justification, that if we allow JUCO players to both play JUCO and then play four years of NCAA D1, older, more experienced players are going to make the team and not push out younger, less experienced, less mature players coming out of high school. Do I have that right so far? I think that's part of it, but it's not all of it. Okay. Well, let's just stay with that. If that is true, why does that not show, by definition, that the NIL payment market is going to be suppressed? Because there is some segment of the labor market that is being foreclosed from selling their services to schools that otherwise would be able to. And the reason that is occurring is because there is a horizontal agreement among all Division I schools that they are not going to deal with a certain segment of the labor force. And it seems to me that in other contexts, that would be kind of textbook refusal to deal type restraint that would be leading to an anti-competitive regime in the labor side. Input market. Tell me why that's the wrong way to think about this. Okay. I think there's a few answers to that, Your Honor. I think starting with, I think, just the core premise of your question, which is that we're already in the ambit of the Sherman Act to begin with, that's only part of what the NCAA is concerned with with these rules. The question is not just about when these rules were passed, there was no indication or interest in suppressing compensation one way or the other. The issue was, instead, having college sports be tied to being a college athlete and pursuing a college degree. Okay. Four years and a five-year. Sorry. I'm sorry. I was just going to say, on the pursuing a college degree front, there's now unlimited transfers where credit hours are not necessarily transferring over among schools. There are other ways in which a player can delay beginning their NCAA eligibility period. To the extent, I'm not sure the delta between allowing a JUCO player to play for two years at JUCO and then transfer over, and some of the other exceptions to the four-year rules that NCAA is allowing. Well, Your Honor, I think the delta comes from allowing the JUCO player to play for two years and then come to Division I and play for four more years. That's the delta. It's not just about whether or not transfers are allowed. It's about whether staying six years of collegiate athletic competition is consistent with the pro-competitive purpose of creating a defined sports offering. But I think going back to the 43 V1 quarterbacks, I think, last year played at sixth year. Right? That's in part because of the COVID year, Your Honor. I think normally you would get four and five years. I think the COVID year is confounding this a little bit. There's also the ability... ...TVs because they just kind of stand to watch, you know, NCAA football played by six-year quarterbacks. Is that what we're looking for in terms of the effect on the consumer side market? If you were looking at the consumer market, yes. But I don't think we even necessarily need to get to the consumer market to win. You can also just look at the labor market. You have the Pullman-Thaler's decision, which talks about substituting players within a market, different competitors within a market, not being a classic anti-competitive harm. What you have here is a classic example of an individual saying that there's harm in a market when that harm isn't even matched by them. I mean, if you look at what the district court said the harms were in this case, based on the analysis it gave in granting an extraordinary preliminary injunction, it was that junior colleges are being disadvantaged relative to Division I, which has no bearing to the injury petitioner suffered, and that people are choosing Division I over junior college, which again has no bearing to petitioner himself. So are you saying JUCO is the right lineup in this case, like a junior college? I think that the district court's analysis would make sense if that were the case, but confronted with the individual who is in front of the district court, the analysis of anti-competitive harms did not make sense. But you only get to this set of issues, Your Honor, if you determine that the transaction at issue in this case is commercial or not. I think the Sherman Act is focused on commerce. No commercial transaction is being directly regulated here. There's a clear line of cases that recognize that distinction from O'Bannon, from Smith, from Bassett. You first look at whether there's a commercial... I'm not sure you're in IL. I know it's our case, but that's a totally different world. We don't agree that it's a different world, Your Honor. I think it is, but... If Your Honor thinks it's a different world, it's a different world. I think every college sports fan thinks that the college sports... It's not pro football, but college football where players are paid in the current regime is quite different than the situation we faced legally, practically, 15 years ago. Practically, of course, grant the premise. I don't think there's a legal difference, because even in the realm of Bassett, whether or not you got to be eligible to play college sports was a gateway to things that connoted immense economic value. It was scholarship and athletic scholarship worth hundreds of thousands of dollars, and all kinds of other incidental benefits that came along with being a student athlete. Universities pay scholarships to lots of people, athletes, but also just scholars. They don't pay NIL to the biology majors usually, so it just feels like that's really changed the scope of college. Understood, Your Honor, but I think that's practically true. There's a question of whether it's legally significant. Your Honor may disagree with that, but then I think there's also a question of what it means to say that every restriction that could incidentally affect one's ability to make NIL is now all of a sudden a commercial rule subject to the Sherman Act, because there really is no end line to where this will go in terms of having college sports be a distinct product, and I think a good way to look at that is to look at the facts of this case. Well, I agree. A lot of your brief and a lot of the amicus brief is really honed in on the five-year rule. It makes college football college football, and I agree with you on that, and there are a lot of other components of that, academic GPA, progression towards degree, other things that are not... I don't think they're really an issue here. I sort of got a sort of slippery slope sense from kind of the briefs. If we struck... If this rule is knocked down, it threatens all of, you know, a broader scope of the rules that make, again, college football college football. This is just a relatively small component of the rules and only affects players that, you know, have played JUCO, and there are a decent number of those that go on the NCAA, but these players are still playing no more than four years in the NCAA football, so I kind of view this as an important case, but not necessarily the case that's gonna knock down the barrier for all the other rules that the NCAA also values. You know, and I certainly hope that's the case, but I think what we've seen in the district court since the district court decision in this case is kind of the opposite of what you're saying, which is you have JUCO folks saying that JUCO years shouldn't count. You have Division II student athletes saying Division II shouldn't count. We've won many of them, but not all of them, and when we've won them... You won the case that set aside JUCO. Yes. You won the Division II challenge in the Seventh Circuit. We won that case, and until a couple days ago, there was a trial set for eligibility on a preliminary injunction in that same exact case in that same exact district court for eligibility for this season. So does that have any impact? Does Division II have any impact on how we should think about JUCO? In other words, Division II schools are NCAA schools. Is there anything to that? It seems to me you might have an argument you're not making, and I don't know. I'm just thinking from a competitor, it seems odd that you would harm your own... If the goal is to harm athletes, or not goal, but you know what I mean, that you would treat D2 and D3... I mean, in JUCO, people would have a really strong case if you said D2 and D3, you can come play four years of NCAA. Is there any benefit to you by the fact that you treat D2 and D3 the same way you treat JUCO? I think part of the issue, part of the reason why this becomes relevant is because of the shifting way in which the labor markets have been issued, have been described in these cases and decided in these cases in a very expedited posture where the petitioners should need to show a substantial likelihood of success on the merits, but are instead coming in and essentially saying, well, Alston says we're right on the market. Well, right off the bat, that can't be true because if you think Alston changed the game, we don't. But if you think Alston changed the game, then another thing Alston says is you have to look carefully at existing market realities before saying that there's a market and harm in that market. None of that is present in this case. If you look at the expert's report, literally no analysis of the new NIL market that's claimed. There's just an assertion that Alston defines the market if there's even a mention of the market at all. So then we're in this phase where it's not clear what the market is. And you have the district judge sometimes saying, well, the market is division one and JUCO players are being excluded. But if that's the case, then JUCO players don't really have standing to raise that claim. So other times the opinion is, well, actually it's all college sports. And if it's all college sports, then there isn't as much of a distinction, I would think between division one, two and division three. So I think part of the perils here are with the way in which the records are being developed in these cases in an emergency posture with very little briefing and virtually no substantive analysis from the other side, which is why, as we pointed out, we do think that the district court erred in this case on the merits, even beyond the commercial issue by first finding a relevant market. I don't think the relevant market was properly determined in the record in this court. I don't think the district court was clear on what the market even is. I think second, there's an error in finding harm in that market. And if you look at the court's decision in Plymouth Whalers, it is a substantive principle of antitrust law that transcends NIL, that you don't look at harm to individual competitors, you look at harm to competition. And in division one or college football generally, you see robust competition for student athletes. There's another error. Can I ask you to wrap up? I'm not sure if colleagues have any questions. I do have one question about what you just said. So back in the day before collective bargaining, the NHL, NFL, NBA draft limitations were all challenged in antitrust. And the theory was that by, for example, NFL, by limiting the draft to folks that were more than three years from their high school graduation, you were foreclosing that labor market to a segment of the population that would otherwise have competed in the market and secured spots on NFL teams. And before collective bargaining, plaintiffs were having a lot of success on that theory. And so I think the relevant market is the division one football market. And I think that there is a primary just concerted refusal to deal with all former GCO players. What is different about NCAA that would permit that regime to go forward? Whereas if we're talking about restaurants or big tech companies, any other employer that defined eligibility in a way that restrains the labor market from a percentage of otherwise qualified individuals would be subject to antitrust scrutiny. So what is the difference with NCAA? I'll give two very brief responses to that because I know time is short. The first is what's different about NCAA is what Justice Kavanaugh recognizes in his concurrence, which is that it's a distinct sports offering that's played by college students in good standing. But the other answer I would give is that to the extent plaintiffs were having success in those cases, a lot of them actually settled and then collective bargaining happened. But to the extent plaintiffs were having success in those cases, it was based on fulsome briefing and argument and litigation in the ordinary course. It was not based on records where you have no economic evidence submitted in the first instance, a small expert report submitted in rebuttal to the NCAA that was an effort to backfill the plaintiff's case. And judges essentially saying, we're going to enjoin your rules based on a limited record with limited briefing and with limited argument without actually properly applying this preliminary injunction standard in the first place, that should require more than that from the plaintiff. That's my last question. You mentioned the Plymouth Whalers case a few times, and I was sort of getting this point to you earlier, but I sort of view NIL as changing college sports in the sense that maybe the Ontario Hockey League arrangement vis-a-vis the NHL was sort of similar to college football vis-a-vis NFL football from 15, 20 years ago. In other words, the OHL players got a very small amount of money, maybe like a scholarship to a university. But now in the NIL world, I think that precedent is less helpful because I think college football is not like what the OHL would have been back in the 2000s. Sure, even if you come to it with that point of view, there's still the fundamental antitrust principle from Atlantic Richfield that you need to look at harm in the market and to competition in the market as opposed to harm to an individual competitor. And I don't think in this case, on this record, or in any of the cases that have gone against us, there's systematic economic evidence of a clear price impact or a clear output impact. In fact, by definition, there's not an output impact because there's the same number of Division I players regardless of who gets to be in or out, but you also don't see a concerted price impact one way or another either. There isn't actually proof that wages are being suppressed in any way by the restriction that you have here. I think if you look at NIL, it's quite the opposite. Are you good? Thank you. You'll have your rebuttal time. Thanks very much. Good morning. Ryan Downton for Diego Papia. May I please have the floor? Yes, thank you. Will you address mootness first as well? Sure. It's actually an area we agree with the NCAA. That doesn't surprise me, but tell me why he's going to play in 2025 no matter what. That's the subject of the PI. That's what's on appeal. No matter what we do, the NCAA said he's going to play in 2025. So why isn't the subject of the preliminary injunction moot? Because the case involves more than that and the ruling on the issue of whether the eligibility rules are commercial, either has the case continue or end. But the district court could decide that as your counsel just said with a more fulsome record, and we have time, why not develop a more fulsome record and then let us look at it? I think for two reasons. First, I think the preliminary issue is purely legal. I don't think you need a more fulsome record to rule that the eligibility rules in question are commercial and subject to antitrust analysis, which would then allow the district court to do a more fulsome analysis in this case. Because I do think that- But that's like advisory to the district court because the district court decided solely in the PI context that Mr. Pavia could play in 2025. And that impacted the JUCO rule. But as I understand it, and I know I had some discussion of this, not the five-year rule because the COVID year was one of those years. And so now when he tries to play a sixth year next year, you're gonna impact the JUCO rule, the five-year rule and the red shirt rule in some fashion. So yes and no. Mr. Pavia is not challenging the five-year rule. I think something that Mr. Killebrew said is very important. Can I ask you a question about that? Could he play next year in a sixth year, and I put that in quotes because of COVID, without the five-year rule being knocked down? Yes. Okay. So the question is when the five-year rule starts to run. Mr. Killebrew said, I wrote it down, I wanna make sure I get it right, that this is about players. They must be pursuing a four-year degree over a five-year period. Mr. Pavia is not challenging that. When you're in junior college, you are not pursuing a four-year degree over a five-year period. The question at the heart of this case and this appeal, assuming it's commercial in nature, is when does the five-year period start to run? Does it start to run your first year as a JUCO player or does it start to run your first year as an NCAA player? If it begins, as Mr. Pavia has asserted, in your first year as an NCAA player, then this is his fourth year. And whether or not he can play next year isn't trying to invalidate the five-year rule or make it a six-year rule if he has played four years without a red shirt in Division I football. So if they're- If you're trying to level up to the five years a red shirt player would receive, on the theory that it's unfair to distinguish someone who's played four games plus post-season competition from Pavia. Exactly, Your Honor. And so that would be the, if the case continues, which it will continue unless the court rules that this is- that the rules are not commercial in nature and not subject to be challenged, then that issue is out there. Now, this case has been stayed at the NCAA's request, which we agreed to pending this appeal. So at this point, if the court defers and says, this is moot, we're going to be back in front of the district court asking for another preliminary injunction, assuming that the district court was correct in its ruling here, that the juco time shouldn't count, and then asking to stack on a determination about the red shirt rule. Which wasn't an issue in the 2025. That's correct. And so while the court- So regardless of what we do, they will still have to decide the red shirt rule? Yes. Unless you do what the NCAA has asked and rule that none of their rules are subject to antitrust review. And I think both this court, the parties in this case, and courts around the country would like the guidance of are these rules subject to antitrust scrutiny? Because if they're not, well, then all of these cases are moot. We believe they are. We don't think it's a close question, but that issue is very much live controversy in this case. We have many cases distinguishing mootness at the P.I. appeal from mootness of the case in district court. And it strikes me that, I mean, including the Anzac decision recently, it strikes me that all of those, on both your and NCAA's theory of mootness, all of those cases would be wrong. Because it's always the case when you're up on a P.I. appeal, or usually the case, that the underlying- like the parties would like an advisory opinion about the merits of the challenge so that they can use it on remand. But that's not really- if there's no case or controversy with respect to the P.I. appeal, which is the only basis for our current jurisdiction, you know, I'm not sure we would like some guidance is a good enough reason not to moot a case. And that's fair, Your Honor. I think then you get back to be capable of repetition by evading review. I don't think, as Judge Wrigley said, that you're going to get players challenging their eligibility years in advance. Really? They could do it their first- so it's my understanding you get two years of eligibility if you're a JUCO player right now. Yes, if you've played two years of JUCO. Like Mr. Pabia could have done it at the minute he showed up in New Mexico State. He could have. I think it would have been premature given the state of the NIL situation at the time. But now, today, Pabia Jr., meaning someone else in his position, shows up at the University of Alabama as a quote-unquote junior because he played two years of JUCO, he can immediately go challenge it. He can. And that might work its way through. But over the next two years- Two years. If we can't work a case in two years, that's shame on us. Two years from the date a case is filed till a circuit court opinion, I don't think it happens that often. It often takes two years to get through the district court- I'll bet you money we can do it in this case. Can we do it before the transfer and the NFL draft portal and everything that happens in January and February of this year? And that's the question. If this gets sent back down, it's likely to come back up to you in a matter of months. And from- On a final judgment, well, essentially on a final judgment record, if you consolidate the PI and MSJ or trial, it seems as though more information in this case rather than less would potentially create a better decision-making environment. And it was a strategic decision. Someone who's litigated many collateral PI appeals and continued in the district court, it was a strategic decision to stay discovery and not press forward in an expedited fashion. So I'm having trouble thinking about how do you think about that with the timing we're supposed to apply for the caseful repetition, yet evading review doctrine. I think you still end up in the same place. Really? Because the district- Let's say next time, person A issues, and the NCAA says, we're done, we want our ruling. We're not going to give a waiver. Right now, you would get a ruling from us, no matter what, if they didn't give the waiver. We all agree on that, right? But they said, we gave a waiver and we're not rescinding, which I think is the right thing to do. I'm not faulting them for it. But I'm just saying like, you could get a ruling. There's no question you can get a ruling. You didn't have to suspend discovery. You could be moving along in an expedited fashion. The minute you asked us for expedited briefing, we gave it, or argument, we gave it. We're happy to give you expedited briefing, but getting a full record makes sense in a lot of ways. I think getting a full record makes sense for the factual analysis with the merits, but there is a preliminary legal issue that the record doesn't need to be more fully developed. It's there. And I don't think it is a close call. I think that's clear from Alston. I think it's clear from Kavanaugh's concurrence. I think it's clear from the development of both NIL and then the house settlement with direct payments to players since then. And I don't think it needs to be done in this case as an advisory opinion because there is a live controversy between the parties. And I think the court could take up- Do you understand what Judge Hermendorfer just asked you? There's not a live controversy as to the 2025 year, which was the subject of the PI. In other words, we review holdings. The holding is you win. The NCAA has now conceded, basically, that you get to play no matter what. What's the live controversy? No matter what we do, Mr. Pavia is going to play quarterback for Vanderbilt in the 2025 season. So that was the result of the ruling. But the ruling itself was that these rules are commercial in nature and the NCAA is violated, or there is a likelihood that Pavia will be able to show a violation of the antitrust laws. The issue of whether the rules are commercial in nature remains a live controversy between these parties, not just capable of revocation and evading review. I have a question, John, if that is- Yeah. So the NCAA has told us that they said they won't rescind this waiver, but what's stopping them? Supposedly, we're on the merits, we rule for the NCAA. I asked your friend on the other side, he said there was no legal theory you would have to sue them if they rescinded their waiver for the year. Is there a reason why the NCAA couldn't? It might look bad, but is there a reason why the NCAA couldn't change their position if they won this case? As a legal matter, I don't think there is. I do think, practically, that would cause them immense public harm. But as a legal matter, could they change their mind? I don't think they have any legally binding documents that says we can't revoke waivers once we've granted them. There are arguments plaintiffs could make as far as detrimental reliance, but that would be in the form of filing a lawsuit to fight the NCAA, not just an automatically, we win because you've changed your mind. I mean, this is both sides have told us there's really nothing stopping the NCAA other than look bad from changing their minds if they won this case. Yes, and that is troubling as someone representing athletes that you want the surety and NCAA rules change over time and athletes have no control over those changes absent a court opinion saying this is the limit or this is what's wrong with a particular rule. And so that is an area where we do think it's problematic if the court doesn't rule that what if the NCAA does change its mind? Can I ask you one more question?  Unfortunately, Padre got hurt this weekend. He could revoke the four game exception and try to play next year? Yes, and- Is the waiver covering next year? It is not. It is a waiver only for this year. And so if he got hurt and is within the red shirt time period, he would not need to challenge the red shirt rule to play again next year. But he would need to still deal with the JUCO rule and the current waiver as it stands would not help him. Anything else on movements? Why don't you move to the merits then? With the merits, I think in this area, you have to start with Alston and I think Judge Hermodorfer you were there as you probably know more about Alston than any of us as far as the reasoning off the paper. If the eligibility rule is, let's go right to commercial in nature, commercial in nature, why isn't GPA? Why aren't minimum credits? I kind of think it's beyond the point. So if you've got restrictions that are a barrier to entry when you have commercial transactions involved, it's commercial in nature. That doesn't mean they're invalid. But is the GPA then? The GPA is a barrier to entry. What I remember is 2.0. Maybe it's something else today, but 2.0 was the magic number to be eligible to play, whether in high school or college. Isn't that a barrier to entry? I mean, in other words, you're saying something completely unrelated to your sport is limiting your earning capacity. I think it, well, first just to note for a JUCO player, it's 2.5 for everyone else is 2.0, which is another issue. But it is a barrier to entry. And we think it's still subject to antitrust analysis. Do I think an antitrust challenge would be successful with that? No. I think under the rule of reason, that is a reasonable restraint on trade for the NCAA. Same thing with five years. Let me ask you about why that's true. Is that because NCAA's differentiated product is the sale of competition by student athletes in collegiate sport? And below a certain GPA threshold, there are not actually, you're not meaningfully associated with being a student or the college such that it's harming the product they're offering. Is that why, in your mind, the GPA is different than the JUCO rule? Yes and no. So I don't think the GPA is different from the JUCO rule in that it is exempt from antitrust challenge. I think it survives the antitrust challenge because of the differentiated nature of college sports. The same with the concept of having five years to play Division I college football. College is not a permanent aspect of life. It is a phase to move through. And the NCAA's goal of graduating students, of having a reasonable number of years, which they've set at five, to move through your four-year degree program, we're not challenging that. We think that though that type of rule would survive under the rule of reason. Where we think the NCAA gets into problems is where they, some of their other rules like JUCO. They're not part of the NCAA monopsony. They're not pursuing a four-year degree. They're really no differently situated, as Judge Campbell noted in his decision in this case, from a prep school player. They're continuing their education. They're playing sports, but the NCAA counts one against your eligibility and not another. But back to the original question, the NCAA's rules that are barriers to entry are subject to antitrust analysis. That just doesn't mean they're invalid. Many of them are not invalid. I think Justice Kavanaugh in his concurrence mentioned the GPA rule, but he didn't believe that that was something that would be successfully challenged or could be. NCAA would say, and this is an absolutely valid point, is we don't want courts intermeddling in every minute eligibility limitation that NCAA promulgates. On your theory, we would be having trials on, is a 2.5 GPA necessary to maintain a differentiated product? Well, what about a 2.4? What about a 2.3? What about a 1.9? I think NCAA's point is that there are certain eligibility rules where it just doesn't make sense to have the court needing to engage in a full rule reading analysis because they're so clearly tied to what it means to offer collegiate level competition. At that point, a quick look may be sufficient, but it's very different to create a quasi antitrust exemption for an industry and saying that, well, because you have a differentiated product, even though you're a sport, even though players get paid, they're in college, and so we're going to create a judicially created quasi antitrust exemption that certain rules are not subject to scrutiny at all. And I don't believe that's the role for the courts. There are certainly many questions around college sports that are an area of tremendous national interest. You can address it through collective bargaining. You could address it through Congress. But until one of those things happen, the courts need to enforce the laws in college sports the same way they would enforce the laws in any other industry. You noted back to the challenges to the NFL draft before collective bargaining. Even since collective bargaining, there have been challenges. The Claret case out of the Second Circuit, let's see, that was back around 2000, before 2000. The Washington District Court, right, and then the Second Circuit, Justice O'Connor. Then Justice O'Connor said it was a collective bargaining exemption, premature. Exactly. And but for the collective bargaining exemption, he wins. Is Claret's theory your theory? Because what I'm wondering is, you're packaging this case out of harm to JUCO institutions in the recruitment of college seniors playing football writ large. Why? Is there a more straightforward theory, which is you are foreclosing 10% of otherwise qualified college football players from the market because of their prior affiliation with JUCO. I didn't see that in, really in any of your case or your evidence. And I'm wondering why. I think it's there. It is maybe was not highlighted strongly enough through our expert opinion. But that's exactly what's happening here. If you go to JUCO, you are foreclosed from playing the same number of years of NCAA football as anyone who did not go to JUCO. And that's direct harm on a class is excluding a class. Well, they're similarly situated to D2 and D3. How is it different? In multiple ways. So first, as Mr. Killaroo said, the NCAA is defining a college athlete as someone pursuing a four-year degree over a five-year period. Division II and Division III are both pursuing four-year degrees over a five-year period. JUCO players are not. Sure, but they're treated the same as JUCO players. In other words, they're using up years of eligibility. I mean, this gets back to like, what's the market? Is the market all college football players or all D1 players? And it seems to me that keeps switching depending on the answer. I think we said that the market is D1. It's for D1 football players. And the harm is on the limitation you're putting on JUCO players. Could a Division II or III player make the argument? They could. But the NCAA has additional defenses. They're going to be able to say you're already at a four-year school. You're pursuing a four-year degree. And they're also going to be able to say you're at an NCAA school. You have joined arm and ops in the U.S. If it's D1 players, then isn't the real harm to the JUCOs themselves who aren't suing in this instance? There is additional harm to the JUCOs, but it is not just harm to the JUCOs. It's harm to that class of players who have been in junior college and are now being prohibited from playing NCAA football. So on some of these issues, your friend on the other side, who we also had a lot of questions for, you're both doing a great job, said that sort of faulted you for not developing in the district court, one, what the market was, and two, what the impact of these rules are on the market. So can you address those points? It's a preliminary injunction stage. And we have horizontal agreements, which generally are just per se invalid. We don't think they are per se invalid here because of the uniqueness of college sports and the necessity to have some horizontal agreements to make it possible. But in cases where you have horizontal agreements, there is a lot more flexibility in the definition of market under the case law. And we think Alston has created a general market definition. And at this stage, we think utilizing the Alston definition and also focusing here on Division I college football is sufficient. So you're not really pointing to the evidence you put forward. You're pointing to Alston and then the preliminary injunction standard, which is maybe your mind a little looser. And then I guess you pulled in the sort of quick review as opposed to a more the rule of reason might require more evidence and thought about this. But I didn't hear you talking about the record that much here in this case. Sure. Well, the record is limited in this case. But there is an expert report and the expert did spend a lot of time talking about the impact on junior colleges. What about your friends on the other side's point that you brought that up for the first time in reply? And I think the same judge just excluded that because you brought it up for the first time in reply. The judge specifically ruled on that at the district court level. He said that prior to the preliminary injunction, all experts and anyone else you want to testify had to be made available for deposition. And the NCAA declined to depose the expert. And so the judge said, I have given you an opportunity and I'm going to consider that evidence. You haven't asked for a continuance of this hearing or anything else to be able to to make that decision. To be able to rebut. OK, go ahead. So are you relying on quick look review? Is that a part? Is that your next argument? No, it's not. And I think I thought you mentioned it. The NCAA said that Judge Campbell erred by performing a quick look. We don't think he performed a quick look. We went through, we think he went through the full rule of reason analysis. At the end, he concluded that the NCAA rule in this case was so far over the line that a quick look would have been sufficient. But I think he went through what's your evidence on the impact here on the market? You've got 10% of NCAA football athletes come from junior colleges. That's in the record. And you've got the amount of money paid a billion dollars in NIL last year. You now have the house settlement. You didn't have it at the time the preliminary injunction was entered. But that's another $20.5 million per school with 70 to 75% of going to football players. Is that enough in your mind that there are 10% of D1 football roster spots taken by Duke co-players? Just positing that number in your expert report is accurate. Is that sufficient to show anti-competitive harm in the labor market for college football? Or do you need to show that then a second order effect on price suppression, i.e. NIL deal payment suppression or output, I guess, suppression in the sense of maybe a lower quality product. How do you think about those? I don't think you need to show more. In any other industry, if you have 10% of the labor market entirely excluded from being able to work in a given industry, that's a significant economic impact. Does it matter that it might be a much lower number at the time they came out of high school? In other words, kids who are just practically kids who are going to Juco aren't the, you know, Arch Mannings of the world. They're kids that even as D1, they're not qualified for one reason or another to be a D1 athlete at the time. I don't think it matters because I still go back to in any other industry, once someone is qualified to be a laborer and the industry has said, we are excluding you because you can't play D1 sports. Like we're excluding you. Like Pabby is a perfect example, right? His story is incredible. But the reality is at the time he came out of high school, he had no D1 offers, as I understand it. Right. He developed as a Juco. I get it. But he had no D1 offers at the time. The exclusion that we're complaining about is not an exclusion out of high school. It's once you've finished Juco and you've developed athletically, you are now qualified to take part in the division one football labor market. And what I worry is where does that stop? What if you have a four year Juco? Just a minute. I know that's not a real thing, but does that mean none of the four years can count? I go back to what Mr. Kilaru said, the difference between Juco and the NCAA school and their differentiated product is a player pursuing a four year degree in a five year period. I understand. Just four years. Oh, so you're saying if a Juco was a four year school... It's a two year degree that gives you four years to finish it. You can play for four years in Juco, but you get a two year degree. Yay or nay, all four years have to not count in the NCAA's calculus. Yeah, I don't think it matters. The question is when do you start at an NCAA school or if the definition when you start seeking a four year degree, whether it's at an NCAA school or not. Either way, what you do before you get those are relevant. You've got Heisman Trophy winners at 28 years old because they went and played another professional sport and developed athletically for nearly a decade. And then they went back to college and they still got four years and they won a Heisman Trophy and there was no negative impact on viewership or anything else resulting from it. So whether it's a Juco that gives you two years or some reason Juco says we'll give you four years to get your two year associate's degree, I don't think it matters. I'm not gonna take my full time unless there are questions, but I do- I think you're pretty close to it actually. Why don't you wrap up unless there's questions? Sure, I'll wrap up where I started, Dalston. Okay, I wanna wrap up with Kavanaugh's concurrence and take some of his language. He talks about price fixing and instead of price fixing, I just wanna substitute the word boycotting. That's what I think we have here with the labor market. Boycotting a class of labor is boycotting labor and boycotting labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work. Businesses like the NCAA cannot avoid the consequences of boycotting labor by incorporating the boycotted labor into their definition of the product. Or to put it in more doctrinal terms, a monopsony cannot launder its boycott of labor by calling it a product definition. The NCAA is not above the law. And then as the majority said, the national debate about amateurism in college sports is important, but our task as appellate judges is not to resolve it, nor could we. Our task is simply to review the district court judgment through the appropriate lens of antitrust law. That's what we asked today. Thank you. All right. I'm going to hold you to three minutes this time, unless my colleagues have questions. I understood your understanding. Ask the bad guys. Just a few very quick factual clarifications on mootness, and then a few points on the merits. We are not going to walk away from the waiver, but I think even if you thought we would, judicial estoppel would stop us from doing that. There's any number of times where I or others have said we're not walking away from the waiver, including about a dozen times earlier today. I also think that if Mr. Did you put other cases on that in your brief or? I don't have cases on it, but I didn't think it was a mockery, but in this specific context, I would say under any understanding of judicial estoppel, the number of times we have said this issue publicly would preclude us from withdrawing the waiver, which we're not going to do anyway. I think if you were in a situation in response to your honor's question where Mr. Pavia were unfortunately to get hurt next week, there would be any number of other eligibility rules that would be affected that you would have to go through and analyze whether they're valid or not under the plaintiff's own theory in this case. And there would be time to do that before next season. But I want to go to the merits now very quickly and just make a couple points. The first is that in a rule of reason and a preliminary, just accept that this is a rule of reason case, which it seems like, you know, maybe there's if we're in the antitrust bucket, it's a rule of reason case. You need to decide it on the record. And I think it's a little bit of a version of the universe to say that in the preliminary injunction posture, they have to prove less than they would normally have to prove rather than more. I mean, they're coming in and trying to change the status quo in an emergency basis. And why does that matter? Well, that is for a few reasons. First, a number of times in argument and in the questions, there was an allusion to the idea that there's a group boycott here. There's no group boycott claim in the complaint. It's literally not a part of this case. That was suggested as a theory recently in the Forker case in the Seventh Circuit that that might be something worth pursuing. It's literally not in the record in this case. It's not in the complaint. It's not a claim that's ever been pleaded. What do you have on the market here? Well, I think there are a number of questions and assertions that the market is the division one labor market, this alleged division one market. If you accept for a moment that that's the argument, junior college players aren't in it. They can only state a claim as to their market if there's a group boycott claim. So then you have the kind of pivot to the different market, which is the market for all divisions. So I understand that now I'm violating my own rules. I'm the one creating the problem. You're saying that in order for them to be part of the division one market, they have to make a group boycott claim. I think I'm saying something different, Your Honor, which is if they're claiming a harm in the division one labor market and they're not in it, then the only antitrust claim that makes sense is a group boycott claim because otherwise they're not in the market and they haven't made the group boycott claim here. But that just kind of bespeaks the broader problem with the record that you have here, which is that there's literally no record evidence of the market in the case. I mean, I would commend Your Honors to look at the expert's report, which was submitted in rebuttal. He does not even have a section that says here is what the relevant market is. It immediately goes to anti-competitive effects and pro-competitive effects. And market definition is kind of the first thing you have to do in an antitrust case. And you have nothing on it here. And if we hadn't put in our expert declaration, they wouldn't even have had their export declaration to begin with because there would have been nothing to rebut. And then if you go past that to anti-competitive harms, where is the evidence of an effect on price or output? Definitionally, there's no effect on price, on output. Do you have any evidence on that in your expert report? Did your expert talk about impacts of the JUCO rule? Yes, Your Honor. I think our expert did talk about this and made the point that as a matter of antitrust economics, you don't just look at harm to an individual competitor. You need to look market wide for analysis of prices or output. And there is none of that here. At the time, there wasn't even a report from the other side, but he made the point. And in response to that, I believe it's, I want to say it's 30. It's one of the in the 30s. I apologize. I don't have that. I could get it for you if I had a minute. Their expert only comes in in response to that and then says there's a harm. But then look at what he provides. There's no quantitative analysis of price. There's no evidence that wages have been suppressed for anyone in any market. There can't be an allegation of output. And if you just think about the basic economic logic, and this is something that's come up in recent cases like Arboleda, typically when you restrict supply, it increases wages. So you would actually have the opposite effect in this case if people are in fact being precluded for market participation. So at minimum, that's assuming that talent is uniformly distributed across the labor force and not that the higher level NIL players have to be scared. Higher level talent, which is why I asked you originally about your theory that you need to displace the older, more experienced, better JUCO players or the less experienced new entrants. And that would suggest to me that their talent is not uniformly distributed such that you can make the increase the labor pool prices go down. Yeah, I know my time is short, so I would just say, no, I appreciate it. I very much appreciate it. Our theory is not that this rule is motivated by any kind of wage suppression theory whatsoever. The rule is motivated by the idea that it puts courts in an impossible line drawing exercise. If instead of 4 over 5, you sometimes have 4 over 6 or 4 over 7 or 5 over 6 or 2.4 instead of 2.5. Our position is that the reason this rule exists is because 4 over 5 is a reasonable product definition that preserves the NCA's unique product. It has nothing to do with wages. But all the other side saying we want 4 over 5 too. You let baseball players come play football. There's the NBA basketball player that's now playing college golf. I mean, you've got all kinds of examples of this. I think they said they want 4 over 5, but I think that kind of vanished the second one of you followed up with a question on it because Mr. Pavia wants to seek maybe a 6th or a 7th year. There's an idea that only division one year should count. What he said in response that was my question. I want 4 over 5 when 5 is the NCA years, not the JUCO years. He's saying next year won't even be 5 because the first two don't count under any scenario. I think that college sports will look a lot different than college sports if you do it that way, because in theory, there's no limiting principle to this and you could have someone play two years in JUCO, four years in division two, and then four years in division one. And under that logic, all 10 years of those would be valid as a matter of college sports. But I think even if you get outside the kind of parade of horribles in the wage suppression example, if that's the kind of lens one wants to look at, there needs to be some evidence of that actually happening. And there's literally no evidence in the record of any price or output effect. So you think you have to have a demonstrated effect on price or output, and it's not enough that the segment of the labor force is just as a result of concerning for people to be able to completely foreclose or even competing for a position? I think the answer might be different in a case where there was a refusal to deal or a group boycott claim pleaded. But where there isn't, which is the case you have under the rule of reason, yes, you would need at least that and you would need some economic proof of that somewhere in the record. Thank you very much. Thank you both to counsel. Your arguments were fantastic. We really appreciate your time. We're sorry to keep you so long, but I think, you know, we have a lot of questions and one way or another, we might see you again. So thank you very much. Thanks.